1    BENJAMIN M. CARSON (Nevada Bar No. 14039)
LAW OFFICES OF BENJAMIN M. CARSON
2    8837 Villa La Jolla Drive #13105
La Jolla, CA 92037
3    TEL:  858.255.4529

4    Attorney for Plaintiff GXP CAPITAL, LLC

5

6                  **UNITED STATES DISTRICT COURT**

7                      **DISTRICT OF NEVADA**

8

9

10

11

12    _____

13    GXP CAPITAL, LLC (a subsidiary of GXP
CDMO, Inc., formerly Bioserv Corporation),
14    a Nevada limited liability company,

15    v.

16    ARGONAUT EMS. a sole proprietorship
owned by Wayne Woodard,
17
WAYNE WOODARD, (#1,2,3 4, 5),
18
19    DANIEL LITTLEFIELD, (#2 and #5 only)

20    and

21    DOE Defendants 1 through 10, inclusive.

22

**COMPLAINT FOR DAMAGES AND
DEMAND FOR JURY TRIAL**

**(1) Breach of Contract**
**(2) Misappropriation of Confidential
Information**
**(3) Intentional Interference with
Prospective Economic Advantage**
**(4) Negligent Interference with Prospective
Economic Advantage**
**(5) Conspiracy to Commit Tortious
Actions**

**JURY DEMAND**

23

24

25       Plaintiff GXP Capital, LLC. (a subsidiary of GXP CDMO, Inc., formerly Bioserv

26   Corporation), "Plaintiff," hereby alleges:

27                       <u>JURISDICTION</u>

28

1      1.      The within action is brought pursuant to California Code of Civil Procedure 3600, and other applicable federal and state statutes, to determine and reduce to money or the equivalent the claims of GXP Capital, LLC[1], hereinafter referred to as "Plaintiff" or "GXP", against Argonaut EMS, a sole proprietorship ("Argonaut"); Wayne Woodard, the owner of Argonaut, Daniel Littlefield, Chairman of the Official Committee of Unsecured Creditors (the OCC) in the bankruptcy matter filed in the Bankruptcy Court for the Southern District of California (the " Bankruptcy Court") which was assigned Case Number 14-08651-MM11(the "Bankruptcy Case"), and DOE Defendants 1-10, inclusive.  As a group, Argonaut, Mr. Woodard, Mr. Littlefield, and the DOE Defendants shall be hereinafter referred to as "Defendants."

2.      Plaintiff is informed and believes that Argonaut is a sole proprietorship formed by Wayne Woodard, in California, for the purpose of identifying an acquisition candidate to provide manufacturing services for the medical device industry.  Plaintiff is informed and believes that Wayne Woodard is a California resident.  Plaintiff is informed and believes that Daniel Littlefield is a Texas resident. Plaintiff is informed and believes that the DOE Defendants are residents of either California or Delaware.  Plaintiff is a Nevada limited liability company with headquarters in Las Vegas, Nevada.   Plaintiff and Parent operate exclusively out of Nevada, and Plaintiff acquired the causes of action described in this herein Complaint for Damages through an asset transfer agreement soon after the Plaintiff was formed on or about September 1, 2017.

---

[1] GXP Capital, LLC properly acquired the causes of action described in this herein complaint through an asset transfer agreement entered into between GXP and its parent company GXP, CDMO, Inc. (formerly Bioserv Corporation), hereinto referred to as "Parent" agreement GXP Capital LLC is a Nevada limited liability company that is 100% owned by GXP CDMO, Inc. Parent has headquarters in Nevada and has been managed from Nevada since the sale of its business to Sorrento Therapeutics on 12/29/16 (the "Sale").  Parent has not had any assets or operations in California since the Sale.  GXP Capital was formed on or about September 1, 2017 and has its headquarters in Nevada. Parent explored moving its state of incorporation from California to Nevada, but this was expensive and technically complex. Most importantly, Parent was advised that it may risk loss of significant tax benefits (mainly its Net Operating Loss carryforward) if it tried to move the state of incorporation from California to Nevada. Parent also registered in Nevada as a foreign corporation.

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

3.      This Court has subject matter jurisdiction over this action pursuant to Title 28, Section 1332 of the United States Code ("U.S.C"), as there exists complete diversity between Plaintiff and Defendants.

BANKRUPTCY CASE SUMMARY

4.      On October 31, 2014, Parent, as Debtor, filed a voluntary petition before the Bankruptcy Court for relief under 11 U.S.C Chapter 11, commencing a bankruptcy proceeding. Parent conducted the business and affairs of Debtor as debtor-in-possession, subject only to the appointment of an Examiner with expanded powers to sell the business of the Parent.  The Examiner was appointed on December 21, 2015 after the occurrence of the conspiracy among the Defendants and the Co-Conspirators described below.  As a result of this conspiracy and other Defendant breaches as described herein, the Examiner was appointed and Parent could not reorganize pursuant to a pending plan of reorganization.  Instead, the Parent's business was sold on December 29, 2016 to Sorrento Bioservices for $3.6 million. Parent subsequently reorganized pursuant to a confirmed Plan of Reorganization (the "Plan") with unsecured creditors receiving 100% of valid claims.  The Plan had an Effective Date of May 26, 2017.

PARENT BACKGROUND

5.      GXP CDMO, INC. (then known as Bioserv Corporation), "Parent," was incorporated in December 1988.  It grew substantially over the years as a contract manufacturing organization ("CMO") for pharmaceutical companies. The original founders sold it to Nextpharma Ltd. , a British company ("NextPharma"), that provided contract manufacturing and drug development services to pharmaceutical companies, in 2007, for over $10 million.  Parent earned about $2 million of EBITDA in 2008, but the business declined dramatically in the following years.  This was mainly due to a lack of customer demand during and after the Great Recession.  This was also caused in part by the lack of financing available to Parent's traditional customers, which were small pharmaceutical companies with significant negative cash flow that were developing new drugs.  In 2011, Nextpharma sold a much larger manufacturing facility in Europe.  Nextpharma's original purpose in acquiring Parent was to "feed" U.S. and particularly West Coast customers of Parent to Nextpharma's larger European manufacturing facility as

3

customers' drug products advanced in clinical trials.  Once the larger European facility had been sold, Parent became an isolated business (it was the only Nextpharma physical asset in the U.S.) and one that was losing money.  As a result, Nextpharma decided to sell Parent.  It was acquired by KESA Partners, Inc. on or about November 27, 2012.

6.   KESA continued to operate the business, but at a loss due to high overhead and to unprofitable contracts that had been inherited from the previous owner.

7.   In late June 2014, due to an unanticipated loss of prospective customer orders, Parent reduced its workforce to better align its costs with its expected revenues.  Despite this reduction in its workforce, Parent met all of its contractual commitments to its customers to manufacture product.

8.   At the time, Parent was working with a joint venture partner, Advantar Laboratories Inc. ("Advantar") to develop a topical cream of two antibiotics for the U.S. Army (the "Army JV").  This was a lucrative contract  that had been awarded jointly to Advantar and Parent the previous year.  When Parent reduced its workforce, Advantar saw an opportunity to misappropriate Parent's share of this valuable contract.  Advantar disparaged Parent's capability with the Army.  Advantar, as the prime contractor, was able also to deny the ability of its partner Parent to make its case to the Army directly that it could continue to meet its contractual commitments in the Army JV, *as Parent had done for every other customer.*  Eventually, Advantar maliciously sued Parent, breaching the dispute resolution clause of the contract between Advantar and Parent.  To protect itself from the Advantar lawsuit, Parent filed for protection under Chapter 11 of the United States Bankruptcy Code.  Parent has since filed a complaint against Advantar regarding this matter asking for damages of over $15 million.  This case is pending in the Bankruptcy Court and in the District Court for the Southern District of California.

9.   Albert Hansen is the CEO of both KESA and Parent.  KESA is the parent of Parent. As part of its efforts to reorganize Parent under Chapter 11, Mr. Hansen sought new investors during 2015 for Parent, including potential parties interested in acquiring Parent.  These efforts were disrupted by Defendants' Conspiracy.

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

## THE ARGONAUT GROUP

10.     On July 23, 2015, Mr. Hansen was introduced to Wayne Woodard by a pharmaceutical executive known to both of them.  Mr. Woodard was interested in a possible investment in Parent in which Mr. Woodard or his financial backers would acquire a controlling interest in Parent.

11.     Mr. Hansen sent Mr. Woodard a confidential presentation on Parent (then named Bioserv Corporation).   Included in this presentation was the following language (the "Confidentiality Language") displayed prominently in bold on the first page.

**BY ACCEPTING THIS PRESENTATION AND NOT PROMPTLY RETURNING OR DESTROYING IT, THE RECIPIENT SHALL BE DEEMED TO AGREE TO KEEP THIS INFORMATION CONFIDENTIAL.**

(See EXHIBIT A)

In accepting the presentation without objection and without returning or destroying the information in this presentation, Mr. Woodard agreed to be bound by the Confidentiality Language, with the Confidentiality Language forming, in part, the text of a binding agreement (the "Confidentiality Language Agreement," which is more fully laid out in Exhibit A, attached hereto) entered into between Parent, Mr. Woodard, and later, via Mr. Woodard, Argonaut.

12.     On July 28, 2015, Mr. Hansen had a teleconference to discuss Bioserv with Mr. Woodard.  Mr. Woodard had also invited a financial executive (the "Investment Partner") with an investment firm (the "Investment Firm")[2].  The Investment Firm was well known and managed hundreds of millions of dollars.  The Investment Firm specialized in making growth equity investments in pharmaceutical and medical device-related ("Pharma") businesses. The Investment Firm was exploring the possibility of providing financing to Mr. Woodard.  The Investment Partner knew Mr. Woodard well as they had worked as fellow senior executives at a prior Pharma

---

[2] Plaintiff may include the identities of the Investment Firm and the Investment Partner as DOE Defendants.

company.  Mr. Hansen send the confidential material to the Investment Partner with the same Confidential Language on the first page.  By accepting the confidential material without objection and without returning or destroying the confidential material, the Investment Partner agreed to be bound by the Confidentiality Language and by the Confidentiality Language Agreement.

13.    On or about August 5, 2015, Mr. Woodard visited Parent.  He had a tour of the facility, a discussion of the business plan and met with the senior management of Parent.

14.    On August 24, 2015, Mr. Woodard requested additional financial information on Parent.  Mr. Woodard offered to sign an agreement that provided for non-disclosure of confidential information (an "NDA") if necessary to gain access to this financial information. Mr. Hansen sent a draft NDA for Mr. Woodard to review.

15.    On that same day, August 24, 2015, Mr. Woodard responded that he could not sign the NDA provided by Mr. Hansen because he was a sole proprietor and that he would incur too much personal liability.  He provided his own version of an NDA (the "Argonaut NDA") instead.

16.    The next day on August 25, 2015, Mr. Woodard asked Mr. Hansen if he had reviewed the Argonaut NDA.  Mr. Hansen signed and returned the Argonaut NDA without any changes.  Mr. Woodard returned a countersigned version to Mr. Hansen on August 26, 2016. (See Exhibit B).

17.    On September 8, 2015, Mr. Woodard requested that the Investment Firm be covered under the Argonaut NDA.  Mr. Hansen confirmed his agreement to this request that same day and Mr. Woodard said he would share information with the Investment Firm.

18.    On September 9, 2015, Mr. Hansen provided Mr. Woodard an offer to become CEO of Parent.  Mr. Woodard said he would consider the offer but later declined the offer on September 14, 2014.

19.    On September 21, 2015, there was a meeting during which Mr. Woodard said he and the Investment Firm would like to enter serious negotiations and due diligence to try to arrange a deal with terms agreeable to all parties.  This meeting was attended by Mr. Woodard, Mr. Hansen and senior management of Parent.  The Investment Partner participated by phone. Mr. Woodard produced minutes of this meeting (Exhibit C).

20.     During the rest of September and early October, there was significant confidential material that was made available to Mr. Woodard and his team.

21.     Mr. Woodard asked Mr. Hansen during this time about Mr. Hansen's views on the value of Parent.   Mr. Hansen pointed out that Pacific GMP, a business that was very similar to Parent located in San Diego, had been acquired for $12 million.  Pacific GMP had revenues of about $3 million and was breakeven.  (See Pacific GMP press release in Exhibit D.)

22.     On Tuesday, October 13, 2015, there was a dinner meeting attended by Mr. Woodard and the Investment Partner.  Mr. Hansen provided some highly confidential information to Mr. Woodard and the Investment Partner.  Various business issues were discussed including a possible reorganization plan and strategy for plan approval (the "Plan Approval Strategy").  Mr. Hansen would have never revealed these details except for the fact that both Mr. Woodard and the Investment Partner were subject to the Confidentiality Language Agreement and the Argonaut NDA.

23.     Soon after, a prestigious law firm representing the Investment Firm (the "Investment Law Firm") contacted Benjamin Carson, primary counsel to Parent.  The Investment Law Firm questioned several aspects of the Plan Approval Strategy.

24.     Mr. Carson also asked if the Investment Partner would sign a new NDA.  The Investment Law Firm responded in an email dated October 18, 2015, "Our client group already has an NDA".  This referred to the Argonaut NDA.

25.     On or about October 22, Mr. Carson sent a revised NDA and requested that the Investment Partner and Mr. Woodard sign the revised NDA.  After further review and discussion, the Investment Firm declined to sign the revised NDA.

26.     As a result of this refusal, Mr. Hansen decided to terminate the Argonaut NDA in accordance with its termination provision.  This provision required the return or destruction of all the confidential information that had been provided to the Investment Group.  On October 30, Mr. Hansen sent Mr. Woodard an email terminating the NDA and requesting destruction or return of all the Proprietary Information.  Mr. Woodard later acknowledged that the NDA was terminated and all information was returned or destroyed.

7

1

2

## NEGOTIATIONS WITH THE OCC ON THE PLAN

27.     The Official Committee of Unsecured Creditors (the "OCC"), in the Bankruptcy Case was appointed by the United States Trustee ("UST") on or about January 2015 to represent the unsecured creditors in the bankruptcy proceedings.  There were three individuals that agreed to be members of the Committee as a result of a request by the UST.  None of the members had any prior bankruptcy experience.  Two of the members were listed as creditors with whom Parent had a dispute.  The OCC elected Mr. Daniel Littlefield, an executive with Modality Solutions, as its chairman.  A lawyer recommended by the UST, Gary Slater, was appointed counsel to the OCC.

28.     Parent prepared a draft disclosure statement that included a reorganization plan (the "First Plan").  If approved by the Bankruptcy Court, the First Plan would have allowed Parent to emerge from bankruptcy and raise the value of its equity to achieve a sale at fair market value.  Parent sent a draft of the First Plan to the OCC.  On September 11, 2015, Mr. Slater and Mr. Carson had a discussion about the First Plan.  Mr. Slater stated he would review the First Plan and discuss with the members of the OCC.

29.     On October 6., 2015, Parent filed the First Plan ( Doc. Nos 312-314) with the Bankruptcy Court.  (Parent subsequently filed a motion for approval on November 2, 2015.)

30.     On October 12, Mr. Slater sent Mr. Carson an email with questions on the First Plan.  Mr. Slater requested certain changes to the First Plan by means of these questions.  He also alleged Parent' weak financial condition.  As a result of the weak financial condition, Mr. Slater suggested that the Bankruptcy Court might convert the case to a Chapter 7 liquidation (a "Liquidation").  Mr. Slater was aware that Parent had stated in the First Plan that, in a Liquidation, the unsecured creditors would receive nothing.  Mr. Slater never challenged or disputed this liquidation analysis.  In fact, Mr. Slater had previously characterized Parent as "administratively insolvent" implying that there was not enough value in the Parent to repay the administrative fees or the estate.

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

31.     Mr. Carson responded to the OCC's questions on or about October 14.  Mr. Carson also requested a call between Mr. Hansen and the OCC members.   Mr. Hansen wished to present the First Plan directly to members of the OCC.  As part of the negotiation process, Mr. Hansen also wanted to determine what changes to the First Plan were necessary to obtain the support of the OCC.

32.     On October 21, 2015, Mr. Slater sent an email to Mr. Carson.  Mr. Slater stated that the OCC did not support a Liquidation.  Mr. Slater stated (correctly, in Parent's view) that, in a Liquidation, none of the professionals[3] would be paid.  However, in view of Parent's financial condition, the Bankruptcy Court may require a Liquidation.  Mr. Slater also agreed to arrange a teleconference between the OCC and Mr. Hansen.

33.     A teleconference was held on November 6, 2015.   On the call were Mr. Slater, Mr. Carson and two members of the OCC, Beth Bertelson and David Davis.   Mr. Hansen provided a brief history of the bankruptcy proceedings, a financial and business update, and a summary of the First Plan.  Members of the OCC asked questions and Mr. Hansen responded.  Mr. Hansen asked for the OCC to support the First Plan.  He also said that he understood that the OCC may require improvements to the First Plan to give its support.  Mr. Hansen asked the OCC to respond with the specific improvements, if any, that would be required.

34.     On November 10, 2015, the OCC submitted its statement of position on the disclosure statement accompanying First Plan. (Doc 329).  It noted that no one had filed an objection to the disclosure statement by the November 6, 2015 deadline.  It also stated that it would not object to a Court order approving the disclosure statement to the First Plan. The OCC pointed out the financial weakness of Parent and its business.   The OCC asked if KESA should contribute more cash in the First Plan so that Parent could pay the administrative costs of the bankruptcy and so that it would have a stronger cash reserve.  It did not question the

---

[3] According to bankruptcy law, professionals hired and approved by the Bankruptcy Court have an administrative claim against the bankruptcy estate.  This is a higher priority claim than the unsecured creditors.  Almost always, administrative claims are paid 100% before the unsecured creditors are paid a penny.  As Mr. Slater implies, the unsecured creditors would receive nothing if the professionals' administrative claims were not paid.

1   compensation being offered to unsecured creditors in the First Plan[4].

2

3                          TENAX DISPUTE SUMMARY

4

5       35.     The following is a summary of the events involving Parent and Tenax

6   Therapeutics, Inc. ("Tenax"), a customer of Parent.  These events occurred between 2011 and the

7   filing by Tenax of an emergency motion to appoint a Chapter 11 Trustee in the Bankruptcy Case

8   (Doc 338, 11/17/15, the "Emergency Motion"), which occurred shortly after the OCC filed its

9   aforementioned statement of position.   Additional detail concerning these events is attached as

10  EXHIBIT E.

11      36.     Tenax entered into a contract with Parent in 2011 whereby Parent would

12  manufacture product for Tenax.   As is often the case in pharmaceutical manufacturing, Tenax

13  purchased certain specialized equipment so that Parent could manufacture the Tenax product

14  ("Oxycyte").  However, the manufacturing process also required a certain specialized sterilizer

15  (the "Truxton Sterilizer") that had been installed at Parent by another customer and thus was not

16  owned by Tenax.  Tenax purchased two complete sets of equipment to manufacture Oxycyte,

17  EXCEPT FOR the critical sterilizer, of which it only had one.  The sterilizer owned by Tenax was

18  manufactured by and located at ARS (the "ARS Sterilizer").  Tenax did not own the Truxton

19  Sterilizer, located at Parent.

20      37.     In 2014, Tenax cancelled scheduled production and incurred a cancellation fee and

21  other charges, which were invoiced.  Tenax disputed these charges and never paid the invoices[5].

22

23

24  _____

25  [4] The OCC had previously requested that the future redemption price percentage of the preferred
    stock being offered to creditors be increased from 50% to 80%.  However, it did not raise this
26  issue in its statement of position.
    [5] This evolved into a dispute between Tenax and Parent which resulted in litigation, some of
27  which is described below.  Ultimately, there was a settlement agreement signed by Tenax and
    Parent at the urging of the Examiner.  This agreement was approved by the Bankruptcy Court
28  during July 2017.

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

38.     The following facts and allegations are based on the filings and sworn declarations made by Tenax:

39.     Later in 2014, Tenax made the decision to discontinue completely its development of Oxycyte. It later sold its rights to the product to Aurum Biosciences, Ltd ("Aurum"), a company located in Glasgow, Scotland.  Tenax also gave Aurum an option to purchase a complete set of equipment to manufacture Oxycyte, including the sterilizer.

40.     On September 30, 2015, ARS notified Tenax, that it would no longer store the ARS Sterilizer and that it had to be removed by October 15, 2015.  Tenax agreed to sell the ARS Sterilizer to Sanguine Corp., with whom Tenax had been in discussions to sell the second set of equipment to manufacture Oxycyte. The sale of the ARS Sterilizer was finalized on October 14, 2015.

41.     Apparently, Tenax was unaware that it did not own both the Truxton and the ARS Sterilizers.  Tenax only owned the ARS Sterilizer.  Despite this, Tenax apparently contracted to sell both the ARS Sterilizer (which Tenax owned) and the Truxton Sterilizer (which Tenax did not own).

42.     On October 7, Aurum contacted Tenax and exercised Aurum's option to purchase the equipment, including a sterilizer.   But Tenax apparently did not realize it only owned one sterilizer (the ARS Sterilizer), which had already been promised to Sanguine and was subsequently sold to Sanguine on October 14.  The urgency to sell the ARS Sterilizer was presumably due to the fact that ARS had notified Tenax that the ARS Sterilizer must be removed from ARS premises by October 15 because ARS was moving locations.

43.     Following the Aurum exercise of its option to purchase the equipment, Tenax General Counsel Nancy Hecox ("Hecox") contacted Parent and asked for return of equipment so that it could be shipped to Aurum.

44.     Tenax had not paid multiple disputed invoices, due to Parent, and dating back to 2014. Parent asked for payment of these invoices.  Tenax refused.  Parent informed Tenax that it would seek Bankruptcy Court approval to release the equipment since this was not an ordinary course of business transaction.  Parent was concerned that it did not have authority to release the

11

equipment without Bankruptcy Court approval.  Parent's creditors might also subsequently claim that Parent had no authority to release the equipment in these circumstances without Bankruptcy Court approval.

45.     On October 9, for unknown reasons, Tenax contacted Sanguine and told Sanguine that due to unforeseen circumstances, Tenax would be unable to sell Sanguine the rest of the Oxycyte manufacturing equipment.  This action was hastily initiated by Tenax apparently without any real basis for doing so.  Parent had never said that it would not return the equipment, only that it would need Bankruptcy Court approval to do so.

46.     On October 14, 2015, Tenax contacted Mr. Carson by email.  Mr. Carson responded to the email and requested that all communications between Tenax and Parent go through Mr. Carson until the invoice-related dispute was resolved. Later that day, Mr. Carson sent an email to Tenax stating that Parent had requested him to prepare a complaint against Tenax for the unpaid invoices.

47.     Tenax claimed that the issue pertaining to the equipment was an "urgent" matter, although Plaintiff alleges this was a misrepresentation to the Bankruptcy Court to justifyTenax's Emergency Motion.  In fact, Parent later learned that Aurum had no urgent need and Sanguine apparently did not even have financial resources to complete the transaction.

48.     At some point, Ms. Hecox realized that she had fraudulently caused Tenax to sell the ARS sterilizer twice. Parent believes and alleges that she panicked and tried to invent a dispute with Parent to cover her tracks.  She eventually misled the Bankruptcy Court by omitting the fact that she had sold the ARS sterilizer twice.  She instead confused and misled the Bankruptcy Court by claiming that the return of equipment was an "urgent" matter.   Tenax eventually misused the bankruptcy process by moving for the emergency appointment of a trustee.  This resulted, in conjunction with the herein-described Conspiracy, in damages to Parent

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

1   and KESA Partners, Inc., the parent of Parent ("KESA") of millions of dollars.   It is not known if

2   Ms. Hecox ever shared the details of her actions with other officers of Tenax or with its counsel.

3        49.      On or about November 15, Tenax counsel called counsel to KESA.  Counsel to

4   Tenax threatened to "blow up" Parent's bankruptcy case if Tenax did not get what it wanted.

5   When Parent did not respond to this outrageous threat, Tenax conspired out of court with Mr.

6   Woodard, Mr. Littlefield, Argonaut and one or more DOE Defendants (collectively, the "Co-

7   Conspirators") to abuse the bankruptcy process by the filing of an Emergency Motion, to make

8   false, unsubstantiated claims about the Parent, to scuttle the First Plan, to collapse Parent's equity

9   value, "blow up" the Bankruptcy Case in order to retaliate against Parent and cause Parent,

10  KESA, and Mr. Hansen financial harm, and to commit the Tortious Actions, as described in

11  further detail below.

12

13                                    THE CONSPIRACY

14       50.      At some point in October or November, 2015, the Co-Conspirators devised, during

15  one or more out of court discussions, a corrupt plan (the "Conspiracy"), conspiring to commit

16  multiple wrongful and tortious actions (collectively, the "Tortious Actions") including, without

17  limitation, abusing the bankruptcy and emergency motion process, misrepresenting Parent as

18  tortious, litigious, and financially unstable, extorting Parent into accepting Argonaut's

19  unreasonably low purchase offer (the "Hostile Bid"), and wrongfully retaliating against Parent for

20  objecting to Tenax's outrageous threat.  Plaintiff is informed and believes that Defendants

21  misappropriated the confidential information covered by the Confidentiality Language Agreement

22  and the Argonaut NDA in order to devise both the Conspiracy and pursue the Hostile Bid.  Mr.

23  Woodard and Argonaut knowingly and wrongfully disclosed this confidential information to the

24  Co-Conspirators, and Mr. Littlefield received the information, on behalf of the OCC, knowing

25  that it was procured in violation of confidentiality agreements.  Plaintiff believes that without

26  disclosure of this confidential information, the OCC, which only weeks earlier was prepared to

27  support the First Plan, would not have agreed to support the Hostile Bid.  The Conspiracy

28  effectively scuttled the First Plan, caused the appointment of the Examiner, forced Parent to incur

                                          13

substantial, additional legal costs, and subsequently caused the series of events that forced Parent to sell its business at an unattractive price to Sorrento Bioservices, rather than at a fair market value.   As a result, KESA and Parent lost millions of dollars.  Plaintiff is informed and believes that the Co-Conspirators arranged the Conspiracy to allow for Tenax to retaliate against Parent and allow for Argonaut to purchase the Parent at the Hostile Bid price of $1.3 million so that there would be sufficient resources to pay the professional fees of the case with little, if any, left over for the creditors[6].

51.     A business very similar to that of Parent[7], Pacific GMP, was sold in August 2015 for about $12 million.  Parent believes this was the approximate value of the economic opportunity lost by Parent because of the Conspiracy, because Parent could have been sold for this amount had there been no Conspiracy interfering with First Plan.

52.     The Argonaut Group, via Wayne Woodward, sent a letter to the OCC and to its chairman, Daniel Littlefield, saying that it would purchase the assets of Parent for the Hostile Bid amount.  In preparing the Hostile Bid, the Argonaut Group used confidential information provided by Parent, thus breaching both the Confidentiality Language Agreement and the NDA. Parent later sent a letter to Argonaut listing thirteen separate items of confidential information that were used by Argonaut to formulate the Hostile Bid (See EXHIBIT G).  Argonaut subsequently denied that it used this information.

53.     As a result of the Hostile Bid and the Conspiracy, the OCC reversed its position of tentative support for the First Plan. Subsequently, Tenax, filed the Emergency Motion three days prior to a scheduled hearing in an attempt to "ambush" Parent, leaving Parent very little time to prepare to defend itself.  The OCC also made unsubstantiated, false statements to the Court which the Court later used to deny Parent an evidentiary hearing on this matter.

---

[6] Even though the one of the named Co-Conspirators, Daniel Littlefield, was supposed to be representing the interest of the unsecured creditors.
[7] According to its press release, Pacific GMP was similar to GXP in revenues, number of employees and profitability.

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

54.     As a result of the Conspiracy, the Court eventually appointed an Examiner with expanded powers to oversee the sale of Parent.

55.     After a lengthy and expensive process which lasted almost a year, Parent was sold for $3.6 million to Sorrento Biotherapeutics on December 29, 2016 (as noted above).  The Sale was initiated and managed by the Examiner and its investment banker.  During the process, Parent tried to obtain financing to support a 100% payout to unsecured creditors, which the Examiner required. Parent was unsuccessful in these efforts. The Examiner then arranged and completed the Sale.  Parent lost millions of dollars as a result of the Conspiracy, because the Conspiracy disrupted the First Plan, caused Parent to sell its business at an unattractive price of $3.6 million instead of at a much higher, fair market price, and caused it to incur substantial, additional legal costs and fees.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

56.     Plaintiff alleges and incorporates herein by reference each and every allegation contained in Paragraphs 1-55, above, as if set forth in full hereto

57.     As described in the facts above, valid, executed, enforceable, and written confidentiality agreements existed between Parent and Defendants in the form of the Confidentiality Language Agreement and the Argonaut NDA.

58.     Defendants breached the Confidentially Language Agreement and the Argonaut NDA by improperly revealing Confidential Information to third parties, including the Co-Conspirators third parties, in an effort to further the Conspiracy, in violation of the Confidentiality Language Agreement and the Argonaut NDA's specific contractual provisions.

59.     As a direct and proximate result of Defendants' breach of the Confidentiality Language Agreement and the Argonaut NDA, including, but not limited to, as is hereinabove alleged, Parent suffered general damages for lost moneys expended and liabilities incurred. These damages include, but are not limited to, Parent's loss of a favorable and early reorganization, Parent's incurring of bankruptcy and litigation expenses between November, 2015

and a loss of approximately 90% of Parent's equity value as of November 2015.  These damages, the rights of which were acquired by Plaintiff from Parent pursuant to an asset transfer agreement, comprise an amount to be proven at the time of trial, which sum Plaintiff is informed and believes and thereupon alleges exceeds the sum of $15,000,000.

## SECOND CLAIM FOR RELIEF

### (Misappropriation)

60.     Plaintiff alleges and incorporates herein by reference each and every allegation contained in Paragraphs 1-59, above, as if set forth in full hereto

61.     As described in the facts above, valid, executed, enforceable, and written confidentiality agreements existed between Parent and Defendants in the form of the Confidentiality Language Agreement and the Argonaut NDA.

62.     Defendants  Argonaut and Wayne Woodard misappropriated the confidential information protected by the Confidentiality Language Agreement and by the Argonaut NDA through improperly revealing the confidential information to third party Co-Conspirators in an effort to further the Conspiracy.  Defendant Daniel Littlefield misappropriated the confidential information by accepting and using its contents, on behalf of the OCC, to further the Conspiracy, despite knowing that the information was protected from disclosure by confidentiality agreements.

63.     As a direct and proximate result of Defendants' misappropriation of confidential information protected from disclosure under the Confidentiality Language Agreement and the Argonaut NDA, including, but not limited to, as is hereinabove alleged, Parent suffered general damages for lost moneys expended and liabilities incurred.  These damages include, but are not limited to, Parent's loss of a favorable and early reorganization, Parent's incurring of bankruptcy and litigation expenses between November, 2015 and a loss of approximately 90% of Parent's equity value as of November 2015.  These damages, the rights of which were acquired by Plaintiff from Parent pursuant to an asset transfer agreement, comprise an amount to be proven at

the time of trial, which sum Plaintiff is informed and believes and thereupon alleges exceeds the sum of $15,000,000.

## THIRD CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

64.     Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 thru 63, inclusive, as if set forth in full hereto.

65.     As supported by the facts alleged hereinabove, Defendants knew that Parent's First Plan would successfully be confirmed and that Parent, after reorganization, could grow its business to the point where it would sell for fair market value. Defendants understood that because of the nature of market factors in which Parent operated, and because of the price that businesses similar to Parent's were being sold for, Parent had a strong economic advantage in, following a successful Chapter 11 reorganization, prospectively selling for a price of $12 million or more.

66.     As supported by the facts alleged hereinabove, Defendants willfully, intentionally, wrongfully, and tortiously interfered with Parent's prospective economic advantage in disrupting Parent's negotiations with the OCC over the First Plan, scuttling the First Plan, and causing Parent to be sold at an unattractive price, to Sorrento Bioservices, instead of at  a fair market price.

67.     As a direct and proximate result of Defendants' tortious interference, including, but not limited to, as is hereinabove alleged, Parent suffered general damages for lost moneys expended and liabilities incurred.  These damages include, but are not limited to, Parent's loss of a favorable and early reorganization, Parent's incurring of bankruptcy and litigation expenses between November, 2015 and a loss of approximately 90% of Parent's equity value as of November 2015.  These damages, the rights of which were acquired by Plaintiff from Parent pursuant to an asset transfer agreement, comprise an amount to be proven at the time of trial, which sum Plaintiff is informed and believes and thereupon alleges exceeds the sum of $15,000,000.

1

2

FOURTH CLAIM FOR RELIEF

3

(Negligent Interference with Prospective Economic Advantage)

4

68.     Plaintiff re-alleges and incorporates herein by reference each and every allegation

5

contained in paragraphs 1 thru 68, inclusive, as if set forth in full hereto.

6

69.     As supported by the facts alleged hereinabove, Defendants knew that Parent's Plan

7

of Reorganization would successfully be confirmed and that Parent, after reorganization, could

8

grow its business to the point where it would sell for fair market value. Defendants understood

9

that because of the nature of market factors in which Parent operated, and because of the price

10

that businesses similar to Parent's were being sold for, Parent had a strong economic advantage

11

in, following a successful Chapter 11 reorganization, prospectively selling for a price of $12

12

million or more.

13

70.     As supported by the facts alleged hereinabove, Defendants negligently,

14

wrongfully, and tortiously interfered with Parent's prospective economic advantage in disrupting

15

Parent's negotiations with the OCC over First Plan, scuttling the First Plan, and preventing Parent

16

from being sold at a fair market price.

17

71.     As a direct and proximate result of Defendants' tortious interference, including,

18

but not limited to, as is hereinabove alleged, Parent suffered general damages for lost moneys

19

expended and liabilities incurred.  These damages include, but are not limited to, Parent's loss of

20

a favorable and early reorganization, Parent's incurring of bankruptcy and litigation expenses

21

between November, 2015 and a loss of approximately 90% of Parent's equity value as of

22

November 2015.  These damages, the rights of which were acquired by Plaintiff from Parent

23

pursuant to an asset transfer agreement, comprise an amount to be proven at the time of trial,

24

which sum Plaintiff is informed and believes and thereupon alleges exceeds the sum of

25

$15,000,000.

26

27

28

FIFTH CLAIM FOR RELIEF

(Conspiracy to Commit Tortious Actions)

72.     Plaintiff alleges and incorporates herein by reference each and every allegation contained in Paragraphs 1-71, above, as if set forth in full hereto

73.     As described in the facts above, each of the Defendants were respectively aware of out-of-court discussions with each of the other Defendants and Co-conspirators to conspire to commit the Tortious Actions and to improperly disrupt and scuttle Parent's First Plan in order to allow for Argonaut to purchase Parent at an arbitrarily low price and to allow for Tenax to improperly retaliate against Parent.  During these aforementioned out-of-court discussions, each Defendant respectively agreed with each other Defendant and Co-conspirator to wrongfully and improperly disrupt the implementation of Parent's plan of reorganization and create the circumstances whereby Argonaut could make the Hostile Bid and Tenax could achieve its retaliatory objective.

70.     As a direct and proximate result of Defendant's conspiring to commit the Tortious Acts, including, but not limited to, as is hereinabove alleged, Parent suffered general damages for lost moneys expended and liabilities incurred.  These damages include, but are not limited to, Parent's loss of a favorable and early reorganization, Parent's incurring of bankruptcy and litigation expenses between November 2015 and a loss of approximately 90% of Parent's equity value as of November 2015.  These damages, the rights of which were acquired by Plaintiff from Parent pursuant to an asset transfer agreement, comprise an amount to be proven at the time of trial, which sum Plaintiff is informed and believes and thereupon alleges exceeds the sum of $15,000,000.

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

1

## **Prayer for Relief**

2      WHEREFORE, Plaintiff prays judgment against Defendants as follows:

3      1.      For compensatory damages in an amount to be proven at trial;

4      2.      For consequential and incidental damages in an amount to be proven at trial;

5      3.      For restitution of all sums wrongfully obtained;

6      4.      For pre-judgment and post-judgment interest;

7      5.      For punitive and exemplary damages;

8      6.      For attorney's fees and costs; and

9      7.      For such other and further relief that the Court deems just and proper.

10

11

12

13   Dated: October 10, 2017

                                        /s/ Benjamin M. Carson
14                                       Benjamin M. Carson, Esq.
                                        *Attorney for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiff's Complaint for Damages and Demand for Jury Trial**

# LIST OF EXHIBITS

| **Description** | **Tab** |
| --- | --- |
| Bioserv Confidential Presentation | A |
| Argonaut NDA | B |
| Minutes from September 21, 2015 Teleconference | C |
| Press release about Pacific GMP Sale | D |
| Detail of Tenax Dispute | E |
| Mysoline Contract | F |
| December 2013 Letter to Argonaut | G |

21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BENJAMIN M. CARSON (Nevada Bar No. 14039)
BENJAMIN CARSON LAW OFFICE
8837 Villa La Jolla Drive #13105
La Jolla, CA 92037
TEL: 858.255.4529

Attorney for Plaintiff
GXP Capital, LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff GXP Capital LLC demands trial by jury of all issues so triable, and of all causes of action raised by this complaint.

Dated: October 10, 2017                         /s/ Benjamin M. Carson
                                                Benjamin M. Carson, Esq.
                                                *Attorney for Plaintiff*

Plaintiff's Complaint for Damages and Demand for Jury Trial

# LIST OF EXHIBITS

| **Description** | **Tab** |
| --- | --- |
| Bioserv Confidential Presentation | A |
| Argonaut NDA | B |
| Minutes from September 21, 2015 Teleconference | C |
| Press release about Pacific GMP Sale | D |
| Supplementary Tenax Allegations | E |
| December 10, 2015 Letter to Argonaut | F |

7/15/2015





# A CMO Platform for Generic Injectables /503B Sterile Fill Compounding and Other Products

*BY ACCEPTING THIS AND NOT PROMPTLY DESTROYING IT, THE RECIPIENT SHALL BE DEEMED TO AGREE TO KEEP THIS INFORMATION CONFIDENTIAL*.



This presentation may not be photocopied, reproduced or distributed to others at any time.

***BY ACCEPTING THIS PRESENTATION AND NOT PROMPTLY RETURNING OR DESTROYING IT, THE RECIPIENT SHALL BE DEEMED TO AGREE TO KEEP THIS INFORMATION CONFIDENTIAL***.

The information contained in this presentation is strictly private and confidential and has been prepared for your information only to assist interested parties in making their own evaluation of the business of Bioserv Corporation ("Bioserv" or the "Company"), and it does not purport to contain all of the information that a prospective party may desire nor has it been independently verified. In all cases, interested parties should conduct their own investigation and analysis of the Company and the data set forth in this presentation. None of the Company or any of their respective affiliates, equity holders, advisers, directors, officers, employees or agents makes any representation or warranty as to the accuracy or completeness of the information contained in this presentation or made available in connection with any further investigation of the Company. By accepting this presentation and not promptly returning or destroying it, the recipient shall be deemed to have accepted the terms of this Disclaimer.

The projections and forward looking statements concerning the operation and financial performance included herein (the "projections") were prepared solely by the Company and were not prepared with a view toward public disclosure or complying with the published guidelines of the Securities and Exchange Commission. In addition, because such projections are based on a number of assumptions and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Company, there is no assurance that the projections will be realized and actual results may vary significantly from those shown. Furthermore, this presentation shall neither be deemed an indication of the state of affairs of the Company nor constitute an indication that there has not been a change in the business affairs of the Company since the date hereof or since the dates as of which the information is given in the presentation. Accordingly, the inclusion of projections should not be regarded as a representation that the projections will be achieved. The actual results may vary from the anticipated results and such variations may be material. The Company nor any of their respective affiliates, equity holders, advisers, directors, officers, employees or agents undertakes any obligation to revise or update any projections for any reason.

This presentation may contain summaries, believed to be accurate, of certain terms of certain documents, but reference is made to the actual documents, copies of which will be made available upon request, for the complete information contained therein. All such summaries are qualified in their entirety by this reference.

Disclaimer

**CONFIDENTIAL**



I.   Executive Summary

II.   Bioserv Background

III.   Generic and Compounding Opportunity

IV.   Management Team

V.   Summary Financial Data

# Confidential Disclosure Agreement

THIS AGREEMENT is made on August 24th, 2015

BETWEEN
Argonaut EMS (Wayne Woodard); and Bioserv Inc. collectively referred to as the "Parties".

## RECITALS
Each undersigned party (the "Receiving Party") understands and acknowledges that the other party (the "Disclosing Party") has disclosed or may disclose information relating to [Argonaut EMS], which to the extent previously, presently, or subsequently disclosed to the Receiving Party is hereinafter referred to as "Proprietary Information" of the Disclosing Party.

## OPERATIVE PROVISIONS
  In consideration of the disclosure of Proprietary Information by the Disclosing Party, the Receiving Party hereby agrees: (i) to hold the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials), (ii) not to disclose any such Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use whatsoever at any time of such Proprietary Information except to evaluate internally its relationship with the Disclosing Party, and (iv) not to copy or reverse engineer any such Proprietary Information. The Receiving Party shall procure that its employees, agents and sub-contractors to whom Proprietary Information is disclosed or who have access to Proprietary Information sign a nondisclosure or similar agreement in content substantially similar to this Agreement
  Without granting any right or license, the Disclosing Party agrees that the foregoing shall not apply with respect to any information after five years following the disclosure thereof or any information that the Receiving Party can document (i) is or becomes (through no improper action or inaction by the Receiving Party or any affiliate, agent, consultant or employee) generally available to the public, or (ii) was in its possession or known by it prior to receipt from the Disclosing Party as evidenced in writing, except to the extent that such information was unlawfully appropriated, or (iii) was rightfully disclosed to it by a third party, or (iv) was independently developed without use of any Proprietary Information of the Disclosing Party. The Receiving Party may make disclosures required by law or court order provided the Receiving Party uses diligent reasonable efforts to limit disclosure and has allowed the Disclosing Party to seek a protective order.
  Immediately upon the written request by the Disclosing Party at any time, the Receiving Party will return to the Disclosing Party all Proprietary Information and all documents or media containing any such Proprietary Information and any and all copies or extracts thereof, save that where such Proprietary Information is a form incapable of return or has been copied or transcribed into another document, it shall be destroyed or erased, as appropriate.
The Receiving Party understands that nothing herein (i) requires the disclosure of any Proprietary Information or (ii) requires the Disclosing Party to proceed with any transaction or relationship.
  Each party further acknowledges and confirms to the other party that no representation or warranty, express or implied, is or will be made, and no responsibility or liability is or will be accepted by either party, or by any of its respective directors, officers, employees, agents or advisers, as to, or in relation to, the accuracy of completeness of any Proprietary Information made avail-

able to the other party or its advisers; it is responsible for making its own evaluation of such Proprietary Information.

  The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. If any part, term or provision of this Agreement is held to be illegal or unenforceable neither the validity, nor enforceability of the remainder of this Agreement shall be affected. Neither Party shall assign or transfer all or any part of its rights under this Agreement without the consent of the other Party. This Agreement may not be amended for any other reason without the prior written agreement of both Parties. This Agreement constitutes the entire understanding between the Parties relating to the subject matter hereof unless any representation or warranty made about this Agreement was made fraudulently and, save as may be expressly referred to or referenced herein, supersedes all prior representations, writings, negotiations or understandings with respect hereto.

This Agreement shall be governed by the laws of the jurisdiction in which the Disclosing Party is located (or if the Disclosing Party is based in more than one country, the country in which its headquarters are located) (the "Territory") and the parties agree to submit disputes arising out of or in connection with this Agreement to the non-exclusive of the courts in the Territory.

Argonaut EMS
By: _____

Name: _____Wayne Woodard_____

Title: _____ CEO _____

Address: 7904 Corte Penca, Carlsbad, CA

Date: _____08/11/2015 _____

Al Hansen
By:_____

Name: _____Albert Hansen_____

Title: _____CEO_____

Address: _____5340 Eastgate Mall  San Diego CA____

Date: _____8/25/2015_____

able to the other party or its advisers; it is responsible for making its own evaluation of such Proprietary Information.

The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. If any part, term or provision of this Agreement is held to be illegal or unenforceable neither the validity, nor enforceability of the remainder of this Agreement shall be affected. Neither Party shall assign or transfer all or any part of its rights under this Agreement without the consent of the other Party. This Agreement may not be amended for any other reason without the prior written agreement of both Parties. This Agreement constitutes the entire understanding between the Parties relating to the subject matter hereof unless any representation or warranty made about this Agreement was made fraudulently and, save as may be expressly referred to or referenced herein, supersedes all prior representations, writings, negotiations or understandings with respect hereto.

This Agreement shall be governed by the laws of the jurisdiction in which the Disclosing Party is located (or if the Disclosing Party is based in more than one country, the country in which its headquarters are located) (the "Territory") and the parties agree to submit disputes arising out of or in connection with this Agreement to the non-exclusive of the courts in the Territory.

Argonaut EMS
By: _____

Name: _____Wayne Woodard_____

Title: _____ CEO _____

Address: 7904 Corte Penca, Carlsbad, CA

Date: _____08/11/2015_____


Al Hansen
By: _____Albert Hansen_____

Name: _____Albert Hansen_____

Title: _____CEO_____

Address: _____5340 Eastgate Mall   San Diego CA_____

Date: _____8/25/2015_____

EXHIBIT C

Monday, September 21, 2015

# Bioserv/Argonaut meeting minutes

Primary meeting Objective: Express formally our intent to enter serious due diligence on a deal with Bioserv

## Agenda

- Discuss some of the items we will need for the valuation process to proceed.  See below for the preliminary diligence requests
- Discuss the Bioserv update on the bankruptcy and request a formal copy of the approved reorganization plan.
- Set a time table
  - Diligence & Valuation review
  - Deal negotiation
  - Bankruptcy resolution
  - Deal complete
- Establishment of a data room/drop box

## Minutes

- Attendees: Al Hansen, Jay Schier, Jim Walter. Paul Grossman (ph), Wayne Woodard, Jack Percoskie(ph)
- After introductions, we had brief overview of the agenda items.
- First topic, we discussed the preliminary diligence questions, Jack asked a few question regarding who and how the financials are prepared and who the key people will be. Bioserv uses and internal book keeper for most day to day activities, and an outside book keeper for mostly close statements and reporting.
- Legal is handled with outside council, one for contracts, etc and another for the bankruptcy.
- After a review of the preliminary diligence Al committed to a meeting with Jack and I to review areas in the diligence that he feels he cannot provide.
  - A/R - Wayne, Jack and Al to meet toward the end of the week to review that list. If here are gaps we will discuss and come to a compromise.
  - A/R - Al committed to the preliminary diligence details by October 5th.
- Al then gave us an update on the bankruptcy and responded to our request for a copy of the reorganization plan and the disclosure statement that he intends to file with the courts.
  - A/R - All committed to the disclosure document including the reorganization plan by October 1st
- Al went on to explain that he intends to deliver a "statement to creditors" by November 1st.

1

Monday, September 21, 2015

- Al also explained that it is his intent to have his plan approved by Dec. 15th

** The next meeting will be arranged around the October 1st milestone of the Disclosure documents and re-organization plan if required.
Finally the Drop box has been established and each of you have been added to this. You should have an invitation in your in box.

2

14 September 2015

# Acquisition of PacificGMP

---

**ABZENA PLC**

**("Abzena", the "Company" or the "Group")**

**Acquisition of PacificGMP**

*Strategic acquisition of GMP biopharmaceutical manufacturing capability in the USA extends service and technology offering, enables the capture of more value from projects, and provides wider cross-selling opportunities across the Group*

**Cambridge, UK and San Diego, CA, USA – 14 September 2015:** Abzena plc (AIM: ABZA), the life sciences company providing services and technologies to enable better biopharmaceutical products, has acquired PacificGMP, a privately held contract biopharmaceutical development and manufacturing company (CDMO) based in San Diego, CA, USA.

The acquisition of PacificGMP is in line with Abzena's strategy to expand its offering and provides the opportunity to capture more value through broader support for its partners' development projects and enables cross-selling of its services and technologies. The acquisition is expected to immediately enhance the earnings of the Group, before amortization of acquired intangible assets. In the 12 months to July 2015 PacificGMP generated revenues in accordance with the IFRS principles of $3.0 million (£1.9 million).

Abzena is acquiring the entire issued share capital of PacificGMP, including settlement of the non-trading liabilities of PacificGMP at completion, for a cash consideration of $7.7 million (£4.98 million), from existing cash resources, and warrants over 564,762 Abzena shares with an aggregate value of $0.7 million (approx. £0.5 million) based on the average price of Abzena shares over the 60 trading days prior to closing. The warrants represent 0.58% of the current issued share capital of Abzena and are exercisable for up to three years from issue at an exercise price of £0.80 per share.

A performance-based incentive scheme, which could provide up to a maximum of 5,129,939 Abzena ordinary shares (5.3% of the current issued share capital) to PacificGMP's executives and key managers, depending on the performance of the business over the next two years, has been established.

PacificGMP provides contract process development and manufacture of biopharmaceuticals, including monoclonal antibodies, recombinant proteins, vaccines, and gene therapy and cell therapy products, for a growing international customer base. PacificGMP was founded in 2005 and is a pioneer in the adoption of single-use manufacturing technology, which is increasingly being used to manufacture biopharmaceuticals. Its service offering includes process and analytical development, non-GMP and cGMP manufacturing, and regulatory support.

**Rationale for the acquisition:**

- Enables Abzena to pursue opportunities to take its clients' projects further along the development pathway so it can capture more economic value
- Adds a further significant line of service revenue with a positive effect on Group earnings
- Provides additional opportunities for Abzena to increase revenue through cross-selling its services and technologies

- Increases Abzena's penetration beyond its existing manufacturing cell line development offering into the growing contract biopharmaceutical manufacturing market, which is forecast to reach $3.1bn in 2016
- Enables Abzena to provide additional support for the development of products based on Abzena's proprietary Composite Human Antibody™ protein engineering and ThioBridge™ ADC bioconjugation technologies, therefore driving further adoption of these technologies
- Provides an operational base in the US, within the major San Diego area biotech hub, to build and support Abzena's international business. PacificGMP will allow Abzena to develop stronger links with its customers in North America and the Asia-Pacific area and to access a network of US West Coast biopharmaceutical companies and academic institutions
- Adds an experienced management team and skilled workforce with industry experience across process development, single-use technology for GMP manufacture and regulatory compliance
- Provides an opportunity to offer PacificGMP's manufacturing services for later stage clinical programmes and niche commercial-scale manufacturing through investment in the expansion of PacificGMP's facility
- Provides a platform for further expansion of the Abzena group through acquisition of additional complementary services and technologies.

On completion of the acquisition, PacificGMP will operate as an integrated member of the Abzena group of companies, which includes Antitope and PolyTherics. Gary Pierce, CEO and General Counsel of PacificGMP, has become President, PacificGMP and Leigh Pierce, PacificGMP's President and CSO, has become Chief Technology Officer (Biomanufacturing), both reporting directly to John Burt, CEO of Abzena.

Gary Pierce, President of PacificGMP, commented: "Over the 10 years since founding PacificGMP, we have been fortunate to work on a broad array of exciting and complex projects with some of the leading physicians and researchers in the biotechnology arena. We've been able to bring our expertise in development and manufacturing to challenging large molecules and to support efforts against many life-threatening and debilitating diseases. We believe that joining Abzena will allow us to build on that capability, helping our partners to reach larger and more diverse populations and enable the development of new therapies, cures and vaccines. We're very excited by Abzena's vision of enabling better biopharmaceutical products by creating an international business with a broad, integrated service and technology offering that can support product development all the way from lead selection through to manufacturing for clinical trials. I believe that the incorporation of PacificGMP's biomanufacturing capability will prove highly attractive to a range of R&D organisations and we look forward to a promising future as part of the Abzena group."

John Burt, CEO of Abzena, added: "PacificGMP provides us with an ideal opportunity to expand our service offering into the high growth biopharmaceutical manufacturing arena and to establish an operational footprint in the US. This acquisition allows us to capture more customer value, provides significant cross-selling opportunities, and is expected to enhance the pace of adoption of Abzena's technologies. We are delighted to welcome PacificGMP and its staff into the Abzena family."

**Further details of the acquisition**

- The Share Purchase Agreement for the acquisition of the issued share capital of PacificGMP was executed between PacificGMP's shareholders and Abzena Inc. (a wholly owned subsidiary of Abzena plc) on 11 September 2015. The acquisition completed on the same day
- PacificGMP's revenue was $3.0 million (£1.9 million) and the net loss for PacificGMP was $0.1 million (approx. £0.1 million) in the year to 31 July 2015 (unaudited results prepared in accordance with IFRS principles)
- PacificGMP had net liabilities of $1.2 million (£0.8 million) as at 31 July 2015 (unaudited results prepared in accordance with IFRS principles)
- The sum of $1.8 million of the total cash consideration of $7.7 million was used to settle shareholder loans and contingent liabilities crystallised by the sale of the share capital
- PacificGMP has 37 employees, all based at PacificGMP's facility in San Diego

- On completion of the acquisition, the non-executive directors of PacificGMP have resigned from the board and John Burt (CEO), Julian Smith (CFO) and Jim Mills (Vice President, Technical Operations) have been appointed as directors of PacificGMP alongside Leigh Pierce and Gary Pierce. There are no changes to the board of directors of Abzena plc arising from this transaction
- PacificGMP has executed a new lease agreement to expand the facility in San Diego from 14,000 to 23,400 sq. ft. to provide a total of five manufacturing clean room suites, as well as additional analytical and process development laboratories

-Ends-

**For more information, please contact:**

John Burt (Chief Executive Officer)
Julian Smith (Chief Financial Officer)
Abzena plc
Tel: +44 1223 903498
Email: john.burt@abzena.com or julian.smith@abzena.com

Christopher Golden and Ivonne Cantu
Cenkos Securities (Nominated Adviser and Broker)
Tel: +44 20 7397 8900

Mark Swallow and David Dible
Citigate Dewe Rogerson (Corporate and Financial PR)
Tel: +44 20 7638 9571
Email: abzena@citigatedr.co.uk

**About Abzena**
Abzena provides proprietary technologies and complementary services in the UK and US to enable the development and manufacture of biopharmaceuticals.

The Group comprises Antitope, PolyTherics and PacificGMP, which between them have built a global customer base including the majority of the top 20 biopharmaceutical companies as well as large and small biotech companies and academic groups.

**Antitope** provides immunogenicity assessment, protein engineering to create humanized antibodies and deimmunised therapeutic proteins, and cell line development for manufacture.

**PacificGMP** provides contract process development and manufacture of biopharmaceuticals, including monoclonal antibodies, recombinant proteins, vaccines, and gene therapy and cell therapy products, for preclinical and clinical studies.

**PolyTherics** specializes in proprietary site-specific conjugation technologies for antibody drug conjugate development and solutions for optimizing the therapeutic properties of biopharmaceuticals.

Abzena has its main operations in Cambridge, UK and in San Diego, CA, USA. The shares of Abzena plc are quoted on the AIM segment of the London Stock Exchange under the symbol ABZA.

www.abzena.com

Exhibit E

Supplemental Tenax Allegations

1.      In 2011, Tenax (formerly Oxygen Biotherapeutics, Inc.) entered into its first agreement with GXP to manufacture both GLP and GMP grade of the Tenax clinical product, Oxycyte.  Subsequently in August 2013, GXP and Tenax entered into a new production agreement (the "Agreement") whereby GXP would perform certain services for Tenax subject to individual work orders.  The Agreement had a five-year duration.  The Agreement stated that work orders should conform to the format of the exhibit affixed to the Agreement (hereinafter referred to as the "Work Order.")  The Work Order provides for a description of services, prices, schedules and due dates, and details GXP's right to charge Tenax cancellation and postponement fees.

2.      According to declarations by Nancy Hecox, General Counsel of Tenax ("Hecox Declarations")[1] filed with the United States Bankruptcy Court, Southern District of California (the "SD Court") in Case No. 14-0861-MM11  ( the "SD Court Case"), from 2008 through 2013 Tenax was developing a PFC emulsion called Oxycyte.  Tenax had a laboratory in Costa Mesa, California where it manufactured GLP grade Oxycyte.  .  As part of the Agreement with GXP, Tenax was to provide all necessary manufacturing equipment except a for a rotary sterilizer ("Client-Provided Equipment" or "CPE").  The Truxton rotary sterilizer (the "Truxton") was already installed by another client of GXP.  The Truxton or equivalent sterilizer was necessary to manufacture Oxycyte.

3.      In February 2012, Tenax entered into a business contract with Aurum Biosciences, Ltd ("Aurum").

---

[1] Ms. Nancy J. M.Hecox, Esq. submitted a number of declarations and email exhibits, including, without limitation, Doc 327-1 and Doc 578 in the SD Court Case.

4.      In the summer of 2012, Tenax made the decision to close its laboratory facility in Costa Mesa, California.  According to the Hecox Declaration , all Oxycyte manufacturing equipment used in the laboratory, except a rotary sterilizer , was moved to a storage facility in Morrisville, North Carolina, where Tenax's corporate headquarters is located. The sterilizer was placed in storage in California (the "ARS Sterilizer") with the company who manufactured the sterilizer.   The ARS Sterilizer , owned by Tenax, was distinct from Truxton Sterilizer, located at GXP and not owned by Tenax.

5.      According to the Hecox Declaration, in 2014, Tenax made the decision to discontinue its development of Oxycyte.  A revision of the Aurum Agreement was finalized in the spring of 2015, which amendment included, among other provisions, Aurum's right to purchase certain Tenax manufacturing equipment used to manufacture Oxycyte.  In the Hecox Declaration., Tenax provided a list of the equipment Aurum had a right to purchase (the "Aurum Equipment").  However, it is not known the terms of such purchase as Tenax did not disclose the entire contract in the Hecox Declaration, only the schedule itemizing the Aurum Equipment.  In any event, Aurum did subsequently purchase the Aurum Equipment except for the ARS Sterilizer.  In August of 2016, Aurum informed staff of GXP that the Aurum Equipment had not been used and was still warehoused in its shipping containers.

6.      On or about March 6, 2014, the parties signed a third work order.  This order billed Tenax a total of $75,000.  Just prior to the manufacture of the batch covered under the third work order, and after only paying approximately $45,000 in fees to GXP, Tenax cancelled the third work order.

7.      Shortly after Tenax cancelled the third work order, GXP invoiced Tenax for the remaining $30,000.  GXP also exercised its rights under Paragraph 1 of the Work Order attached

2

to the Agreement and assessed a cancellation fee of approximately $37,500 against Tenax.

Tenax paid neither the $30,000 invoice nor the $37,500 cancellation fee.

8.      On or about June 2014, the GXP downsized its work force to align its expenses

with its expected revenues.  Despite this, GXP was able to meet the requirements of its

customers.

9.      On October 31, 2014, GXP, as Bioserv Corporation, filed the Chapter 11 Petition

to protect itself from the litigation initiated by Advantar Laboratories, Inc.

10.     According to the Hecox Declaration, on June 2, 2015, Brandon Beagle,  New

Alliance BioSciences but formerly Sanguine Corp prior to name change on June 26, 2015

"Sanguine") contacted John Kelly, CEO of Tenax expressing an interest in purchasing Tenax's

equipment used in the manufacturing of Oxycyte.

11.     Mr. Kelly forwarded the email communication to Ms. Hecox on or about that same

day.  At the time Sanguine initiated contact with Tenax, Tenax claims it had two complete sets

of Oxycyte manufacturing equipment.  One set was in GXP's facilities [the CPE which did not

include the Truxton], the second set was in Tenax's storage facility in Morrisville, North

Carolina, with one additional piece of equipment (the ARS Sterilizer) stored in California.

Apparently, Tenax did not realize it did not own the Truxton sterilizer.

12.     Mr. Benjamin Carson, counsel for GXP,  contacted Ms. Hecox via letter on March

3, 2015, notifying Tenax that it owed Bioserv $67,500.  This was the aggregate of a

postponement fee and a cancellation fee invoiced by Bioserv for the production run contracted

for under Work Order #3 to the Agreement.  Tenax disputed this invoice. There was additional

correspondence on this matter on March 17, 2015, June 2, 2015, and June 18, 2015.

THE EQUIPMENT DISPUTE

3

13.     According to the Hecox Declaration, on September 21, 2015, a confidential disclosure agreement was executed between Sanguine and Tenax and discussions began on the sale of the Oxycyte manufacturing equipment Tenax had in storage in Morrisville, North Carolina.  Ms. Hecox informed Mr. Beagle that she needed to check Tenax' records to see exactly what the equipment was and the condition it was in, but that it was her understanding the equipment was a duplicate of that held in another facility that Tenax anticipated to be sold for $75,000.  Although Ms. Hecox does not state this, GXP alleges she is referring to an anticipated sale of all the equipment to Aurum.

14.     On September 30, 2015,  Ms. Hecox was contacted by ARS , the manufacturer of the ARS sterilizer owned by Tenax (the "ARS Sterilizer")  in California and informed that due to the relocation of ARS, Tenax had to have the ARS Sterilizer removed from their facility by Tuesday, October 15, 2015.  On October 1, 2015, Ms Hecox contacted Mr. Beagle to inform him that in addition to the equipment in Morrisville, North Carolina, Tenax had a sterilizer available and asked him if Sanguine was interested in purchasing it.

15.     According to the Hecox Declaration, on October 7, 2015, Aurum contacted Tenax to exercise its rights under the Aurum Agreement to purchase the Aurum Equipment.  Again, according to the Hecox Dec., this included a sterilizer.

16.     On October 14, 2015, Sanguine and Tenax finalized a purchase agreement for the ARS Sterilizer.  Apparently, Ms. Hecox failed to realize that Tenax owned only one sterilizer (the ARS Sterilizer) and did not own the Truxton Sterilizer at GXP's facility.  It appears that Aurum had already exercised its right on October 7, 2015 to purchase the Aurum Equipment, including the ARS Sterilizer[2].  *If so, Tenax fraudently sold equipment to Sanguine that it had already contracted to sell  to Aurum.  Tenax deliberately hid this important fact from the SD*

---

2

**GXP's Complaint for Damages**

*Court.*  Instead, GXP repeatedly insisted that the return of the equipment from GXP was an urgent matter.

17.     Ms. Hecox then contacted Keith Holmgren of GXP, a mid-level manager.  Mr. Holmgren referred this to the GXP's senior management.  GXP was under strict SD Court supervision of its operations.  GXP believed it did not have the authority to release the equipment without the approval of the SD Court.  Earlier in the proceedings, the U.S. Trustee had questioned the donation of used laboratory glassware to a local school.  The used glassware had no commercial value, yet the U.S. Trustee was exercising proper supervision of the Plaintiiff under the rules applicable to bankruptcy proceedings.  Also, in the case of Tenax, there was a complicating factor.  As described above, there were disputed invoices of $67,500, which Tenax had refused to pay.  If GXP released the equipment to Tenax without the approval of the SD Court, GXP thought it would be vulnerable to a possible creditor claim that GXP diminished the claims of the estate and improperly exceeded its authority.

18.     As a result of the above, GXP directed that its counsel, Benjamin Carson, handle all discussions with Tenax. On October 7, Mr. Carson notified Ms. Hecox of GXP's decision. There was subsequent communications and Tenax objected to having to go through Mr. Carson. Tenax also claimed the matter was urgent, or at least time-sensitive, although it failed to provide specific facts to support that assertion.  Tenax was known by those at GXP that had dealt with Tenax to be a "difficult" customer.  GXP believed that Tenax was just being difficult again, given the historical relationship.  GXP was also very much focused on Plan that it had recently filed with the SD Court.  Given the limited resources of the GXP, it focused its efforts on the most urgent problems while also developing customers and executing its manufacturing schedule.

**GXP's Complaint for Damages**

19.     Tenax never disclosed the Aurum agreement.  According to knowledge and belief, staff of GXP later learned in subsequent discussions with Aurum in August 2016 a fact that causes GXP to believe that Tenax' statements of urgency in October 2015 may have been deliberately misleading.  Despite the fact that Tenax claimed that Aurum urgently needed the Aurum Equipment in October 2015, ten months later in August 2016, the equipment apparently was still sitting in a warehouse in the shipping containers used to ship the equipment from GXP to Aurum.  Moreover, the manufacturing process used to manufacture Oxycyte was done with the Truxton Sterilizer still in use at GXP's facility.  Switching to a new sterilizer would have added meaningful cost and at least some validation of the new production process.  Aurum speculated in August 2016 that it may be least expensive to ship the equipment back to GXP for the next production run.  At the time (August 2016), Aurum thought existing supplies were adequate and did not foresee the need for a new production batch until some time in 2017.

20.     Although Sanguine is a pink sheet company, its market capitalization according to public sources was about $290,000 as of April 21, 2017.  There is little information available on this company.  No active website could be found.  The last filings according to the SEC EDGAR database were a 10-Q filed on November 14, 2012 and a notification of inability to timely file on March 29, 2013.  Based on this information, it is not clear that Sanguine had the financial resources to purchase any additional equipment that Tenax was offering to sell.  However, Sanguine apparently did purchase the ARS Sterilizer that had been previously contracted for sale to Aurum.  .

21.     On October 9, Tenax contacted Sanguine and told Sanguine that due to unforeseen circumstances, Tenax would be unable to sell Sanguine the rest of the Oxycyte manufacturing equipment at this time. Again, there has been selective disclosure by Tenax regarding its discussions with Sanguine so it is impossible to verify the validity of Tenax claims.

6

22.     On October 14, 2015, Ms. Hecox contacted Mr. Carson by email.  Mr. Carson responded to the email and requested that all communications between Tenax and Bioserv go through Mr. Carson until the invoice-related dispute is resolved.  Later that day, Mr. Carson sent an email stating that GXP had requested him to prepare a complaint against Tenax for the unpaid invoices.

7

# HINES HAMPTON
### ATTORNEYS AT LAW

LAS VEGAS OFFICE
6952 ENCORE WAY
LAS VEGAS, NV 89119.
TEL: (702) 933-7829
FAX: (702) 974-1709

WWW.HINESHAMPTON.COM

COSTA MESA OFFICE
3090 BRISTOL STREET,
SUITE 300
COSTA MESA, CA 92626
TEL: (714) 513-1122
FAX: (714) 242-9529

December 10, 2015

***Sent via Mail & E-Mail***

Argonaut EMS
c/o Wayne Woodward
7904 Corte Penca
Carlsbad, CA 92009
paso.cab@gmail.com

Re:    ***Breach of the Confidential Disclosure Agreement***

Dear Mr. Woodward:

Please be advised that we represent Kesa Partners, Inc. ("Kesa") in regards to the Confidential Disclosure Agreement between Argonaut EMS ("Argonaut") and Bioserv Corporation ("Bioserv"). Kesa is the majority shareholder of Bioserv and is an equity security holder in Bioserv's Chapter 11 Voluntary Petition entitled In Re: Bioserv Corporation, United States Bankruptcy Court, Southern District, Case No. 14-08651-MM ("Chapter 11 Bankruptcy Proceedings"). A copy of the Confidential Disclosure Agreement is attached to this letter.

It has come to our attention that you violated the Confidential Disclosure Agreement subsequent to your disclosure of Bioserv's confidential and proprietary information to Telegraph Hill Partners ("THP"). Argonaut and/or THP used the confidential and proprietary information to evaluate, construct and extend a $1.3 million dollar offer to the Official Committee of Unsecured Creditors ("OCC") in the Chapter 11 Bankruptcy Proceedings for purposes of acquiring Bioserv. THP's offer has caused Kesa damages, including but not limited to, diminished value of Kesa's stock in Bioserv.

In July 2015, Kesa was told Argonaut was interested in purchasing a current Good Manufacturing Practice ("cGMP") manufacturer with a U.S. Food and Drug Administration ("FDA") medical device registration to manufacture high volume medical devices. Accordingly, Kesa's President, Albert Hansen, reached out to Wayne Woodward from Argonaut. During discussions with Mr. Hansen, Argonaut made it clear that it was interested in acquiring Bioserv once Bioserv concluded its Chapter 11 Bankruptcy Proceedings. Thus, on August 24, 2015, Argonaut and Bioserv executed a Confidential Disclosure Agreement to openly discuss confidential and proprietary information of Bioserv's business and finances.

Bioserv's confidential and proprietary information included discussions of Bioserv's reorganization plan, confidential discussions concerning the OCC; discussions of strategy and

December 10, 2015
Page 2

negotiations with the OCC; financial projections; historical financial records, including direct access to Bioserv's accounting system; customer list and potential customers; sales process; information of prospective customers in Bioserv's salesforce.com account; Bioserv personnel and their roles; communications with Bioserv's senior management; Bioserv's evaluation of its management team and itself; salary information of Bioserv's employees; information of Bioserv's creditors; information of 503B plans; and information of prior FDA interactions, including inspection results and internal Bioserv management assessment of recent FDA interactions.

Pursuant to the Confidential Disclosure Agreement, in consideration of Bioserv disclosing proprietary information to Argonaut, Argonaut agreed:

> (i) to hold the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials), (ii) not to disclose any such Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use whatsoever at any time of such Proprietary Information except to evaluate internally its relationship with the Disclosing Party, and (iv) not to copy or reverse engineer any such Proprietary Information.

After the Confidential Disclosure Agreement was executed, Argonaut introduced Paul Grossman from THP to Kesa. It was Kesa's understanding the reason for involving THP was to obtain financial support in acquiring Bioserv. In October 2015, a meeting between Mr. Hansen, Mr. Grossman and Mr. Woodward took place to discuss the potential acquisition of Bioserv. Following the meeting, Kesa asked Argonaut and THP to sign a new confidential disclosure agreement that included language pertaining to extension of offers to third parties. Both Argonaut and THP declined to sign a new confidential disclosure agreement while acknowledging they were subject to the Confidential Disclosure Agreement.

On October 30, 2015, Kesa sent correspondence to Argonaut terminating the Confidential Disclosure Agreement and further discussions on the acquisition of Bioserv. The Confidential Disclosure Agreement provides:

> Immediately upon the written request by the Disclosing Party at any time, the Receiving Party will return to the Disclosing Party all Proprietary Information and all documents or media containing any such Proprietary Information and any and all copies or extracts thereof, save that where such Proprietary Information is a form incapable of return or has been copied or transcribed into another document, it shall be destroyed or erased, as appropriate.

December 10, 2015
Page 3

        Kesa requested Argonaut to return all confidential and proprietary information pertaining to Bioserv.  Kesa also requested Argonaut to destroy any confidential and proprietary information in its possession.

        In November 2015, Kesa became aware that Argonaut and/or THP made a $1.3 million dollar offer to the Official Committee of Unsecured Creditors of Bioserv's Chapter 11 Bankruptcy Proceedings.  On November 19, 2015, the Bankruptcy Court held a status conference to discuss among other things, the $1.3 million dollar offer extended to the Official Committee of Unsecured Creditors.  The Bankruptcy Court asked counsel for the Official Committee of Unsecured Creditors, Gary E. Slater, to send a copy of the offer to Kesa and Mr. Hansen.  Mr. Slater told the Court that the buyer wanted to keep the offer confidential.  The Court dismissed Mr. Slater's attempt to keep the offer confidential and stated "one of the unfortunate realities of the bankruptcy process is it's as transparent as any.  And the time has come for that transparency to be respected here."  Mr. Slater conceded and stated he would inform the buyer of the requirement to disclose the offer to Kesa and Mr. Hansen.  To date, neither Kesa nor Mr. Hansen has received the offer sent to the Official Committee of Unsecured Creditors.

        We demand that you provide us with a copy of all versions of the $1.3 million dollar offer extended to the Official Committee of Unsecured Creditors within ten (10) days from the date of this letter so we may evaluate this matter further.  Failure to provide a copy of the $1.3 million dollar offer will result in a lawsuit against Argonaut, THP and Mr. Woodward for breach of the Confidential Disclosure Agreement.

        Should you have any questions or concerns, please do not hesitate to contact our office.


                                        Regards,

                                        HINES HAMPTON

                                        Mahadhi Corzano